UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA   02 FEB 27 PM 4: 26
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| JENNY PITTS, | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | CV 01-BU-1449-S |
|  | ) |  |
| MARVIN'S, INC., | ) |  |
|  | ) | ENTERED |
| Defendant. | ) |  |
|  |  | FEB 27 2002 |

## Memorandum Opinion

In the above-styled action, Plaintiff Jenny Pitts brings claims alleging that her former employer, Defendant Marvin's, Inc., subjected her to sex discrimination and is liable under the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). In particular, Plaintiff claims that Defendant demoted and discharged her because she is a woman and that Defendant paid her less than similarly situated male employees. Now before the Court is Defendant's motion for summary judgment on all claims. (Doc. 17). The parties have submitted evidence and briefs in support of their respective positions on the motion, which is now ripe for decision. In addition, Defendant has also filed a motion to strike

portions of an affidavit sworn by Plaintiff and filed with her materials in opposition to the motion for summary judgment. (Doc. 21). Upon consideration of the record and the arguments of counsel, the Court concludes that Defendant's motion to strike is due to be **GRANTED IN PART AND DENIED IN PART** and that Defendant's motion for summary judgment is also due to be **GRANTED IN PART,** as it pertains to Plaintiff's Title VII demotion and discharge claims, **AND DENIED IN PART**, as it pertains to her Title VII and EPA wage claims.

I.  SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories,

admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex</u>, at 323. <u>See also</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its initial burden, the nonmoving party must point to evidence in the record indicating that there is a genuine issue of fact for trial, <u>i.e.</u>, there must be sufficient evidence to allow a factfinder reasonably to return a verdict in the nonmovant's favor. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248, 252. However, in resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. <u>Rooney v. Watson</u>, 101 F.3d 1378, 1380 (11th Cir. 1996) (<u>citing</u> <u>Hale v. Tallapoosa Co.</u>, 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 151 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299). Keeping these standards in mind, the Court turns to the record in this case.

## II.  BACKGROUND[1]

Defendant operates a chain of retail home improvement stores in the Southeast.  Plaintiff was initially hired by Defendant in May 1993 to work as a sales associate in its Anniston, Alabama store.  Plaintiff resigned in January 1994, but she was rehired by Defendant, again as a sales associate, in August 1995.  About seven months later, Plaintiff became a commercial salesperson.  She continued in commercial sales until August 1997, when she was promoted to participate in Defendant's management training program.  Thereafter, Plaintiff became a merchandise coordinator or assistant manager - merchandising.  She served in that capacity for about a year before being promoted to a store manager position at Defendant's Decatur, Alabama, location in November 1998.  At that time, she received a pay raise to an annual salary of $40,000.

When Plaintiff first became the manager of the Decatur store, the budget for the coming year, 1999, had already been approved by Rodney Geeslin, then the regional manager to whom Plaintiff reported.  When Plaintiff accepted the job, she understood that a

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record.  These are the 'facts' for summary judgment purposes only.  They may not be the actual facts.  <u>See</u> <u>Cox v. Administrator U.S. Steel & Carnegie</u>, 17 F.3d 1386, 1400 (11th Cir. 1994)."  <u>Underwood v. Life Ins. Co. of Georgia</u>, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

competing home improvement store, Home Depot, was soon going to be opening a location in Decatur.   However, what Plaintiff did not know was that the target figures in the 1999 budget for her store did not account for the increased competition she was certain to face from the anticipated Home Depot store.   In about June 1999, Thomas Lawson became the regional manager and Plaintiff's immediate superior.   At that time, Lawson told Plaintiff that the forecasted figures in the budget for her store were about 25% too high because of the new Home Depot store.   Therefore, Larson allegedly told Plaintiff that she should concentrate on store appearance, "stock outs," inventory, and employee problems, and that if she could stay within 25% of the budget, he would "cover [her] or take the heat."

The record suggests that the Decatur store exceeded its budgeted target for net sales in both January and February 1999, by about 12% and 13%, respectively.  Plaintiff's Exhibit 1 to Lawson's Dep.   But by the end of March, the first full month in which the new Home Depot store had been open, actual net sales for the month at Plaintiff's store plummeted to about 31.5% below the budgeted amount for the month.  See id.  Net sales were again off budget in April, but by only about 19.4%.  See id.  For the next five months, however, actual monthly net sales in relation to budgeted net sales began a steady slide: from May through September, the percentage difference figures were approximately -21.3, -23.4, -27.5, -30.2,

and -29.9, respectively.  See id.  However, the record shows that on the year as a whole through September 25, 1999, the store's actual net sales were still within about 80% of the budget target, see Defendant's Exhibit 12 to Plaintiff's Depo.

While Plaintiff was able to keep her store's net sales within 25% of the 1999 budgeted net sales targets, at least during some individual months and on a year-to-date basis, her store's "operating income" did not fair as well.  Defendant's store income statements show, that, by June 26, 1999, Plaintiff's store had an "actual" "Store Operating Income" (hereinafter "SOI")[2] of about negative $23,600 for the year to date, which was about $70,300 less than the positive $46,700 figure budgeted for the store for the category.  See Defendant's Exhibit 9 to Plaintiff's Dep.  In the following month alone the Decatur store posted an additional actual SOI loss of about $25,500, bringing the year-to-date actual SOI loss to approximately $49,000, as of July 24, 1999.  Defendant's Exhibit 10 to Plaintiff's Dep.  By comparison, the budget had set

---

[2]The meaning of "store operating income" is a subject of controversy between the parties.  In short, Defendant claims that SOI is the amount of actual net profit or loss for a store, while Plaintiff has asserted in an affidavit that SOI does not implicate any "real money" loss in her case, but is, rather, merely a hypothetical figure derived from comparing a store's actual income or loss to forecasted or target income amounts set forth in a store's pre-prepared budget.  The Court will further explain and address this issue when considering the merits of Defendant's motion to strike.

SOI target amounts of +$5,200 for the month and +$52,200 for the year to date.  Id.  Unfortunately for Plaintiff, by August 21, 1999, the store had a current-month actual SOI of approximately minus $48,800 and a year-to-date actual SOI of about minus $98,000. Defendant's Exhibit 11 to Plaintiff's Dep.  The budgeted SOI figures for this period were negative $5,700 for the month and +$46,400 for the year to date.  Id.

Plaintiff acknowledges that Larson held a meeting at which she was present and he discussed her store's performance.  At that time, Larson allegedly reassured Plaintiff that "the store looks great" and "is running great."  Plaintiff's Dep. at 111.  However, he also warned Plaintiff, "We're in a serious situation.  Corporate is putting the heat on."  Id. at 110-11.  He continued, "[C]orporate has given us thirty days to try to turn the store, . . . we've got to start turning some sales."  Id. at 111-12. Therefore, at Larson's instruction, Plaintiff went "out on the road" for the next month, working long hours seven days a week, trying to increase sales to commercial customers.  Unfortunately for Plaintiff, such measures did not alleviate the Decatur store's financial woes.  According to the financial records, the store's "actual" SOI for the next month, ending September 25, 1999, was minus $38,100, which brought the store's "actual" SOI for the year to date to minus $136,200. Defendant's Exhibit 12 to Plaintiff's

Dep.  The budget SOI figures for this period were +$10,500 for the month and +$67,600 for the year to date.  Id.

Lawson again met with Plaintiff on or about October 12 or 13, 1999, at which time he informed her that she was going to be demoted from her store manager position to the management training program.   Plaintiff contends that Lawson told her that such decision had been made because of "low sales."  Plaintiff reminded him about the budget numbers being wrong, but Lawson told her that the situation was "just political."  Plaintiff's Dep. at 133.  And although Plaintiff never raised the issue, she says that Lawson repeated several times during their conversation that her demotion had nothing to do with her being a woman.  Lawson told Plaintiff that Defendant's vice President, Tom Seifert, had said that she had been a good employee, Plaintiff's Dep. at 120, and Lawson explained that Plaintiff would remain in the training program for four months at her same salary, probably working out of either the Anniston or Sylacauga, Alabama, store, and then she would be eligible to be transferred into a store manager or assistant store manager position when and where one became available.  Plaintiff inquired of Lawson whether, if she accepted the training program position, Defendant would pay for expenses she incurred in connection with relocating, as it had done for her on previous occasions.  Larson replied that Defendant was not going to do so.  Plaintiff then

asked Lawson whether she had any other options, to which Lawson allegedly answered, "Well, you can be terminated."  Plaintiff's Dep. at 123.  Plaintiff asked whether she would receive severance pay if she were terminated, and Lawson said that she would. Plaintiff told Lawson that she needed some time to think over the situation and that she would call him with an answer.

The following evening, Plaintiff telephoned Lawson at his home.  Plaintiff expressed concerns about the uncertainty regarding where she might be moved next.  She also raised the issue of the high cost of moving, and she again asked about whether Defendant might pay her moving expenses.  Lawson reiterated that Defendant was not going to pay such costs.  Plaintiff allegedly asked Lawson, "Is my only other option termination?," to which he answered, "Yes."   Plaintiff responded, "Okay, as for my best interests, I can't afford to do what you're asking me to do, so I guess I'm terminated."  Plaintiff's Dep. at 127.  After asking Lawson again about severance pay, she advised him that she would not be returning to the store and that she would call the store office manager to retrieve several items of property she had belonging to Defendant.

The next day, Plaintiff received a telephone call from Rachael Cates, Defendant's human resources director, who requested to meet with Plaintiff.  At their encounter, Cates told Plaintiff that she

did not want Plaintiff to leave without any severance pay, but that in order to receive it, she would have to sign a release form stating that she had resigned her employment. Plaintiff said she would not sign something saying that she had resigned because she had been fired. Cates responded by saying that she had not fired Plaintiff, but Plaintiff maintained that Lawson had in fact done so on the phone the night before. Ultimately, Plaintiff declined to sign the resignation and release form, and she did not receive severance pay.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). After subsequently receiving a right-to-sue notice from that agency, she filed the instant action in this Court on June 6, 2001. In her complaint, Plaintiff alleges that Defendant discriminated against her in her employment on the basis of sex. More specifically, she brings Title VII claims challenging her termination, which she suggests in her complaint was "constructive"; her demotion from store manager; and her wages, which she says was less than that of "similarly situated males." This alleged pay disparity is also the subject of her claim under the EPA.

### III.   DISCUSSION

**A.   The Title VII Demotion and Discharge Claims**

<u>1.   Demotion</u>

Plaintiff claims that Defendant's decision to demote her from her store manager position to a management trainee position was based upon her gender.  Title VII makes it unlawful for a covered employer to "discriminate against any individual with respect to [her] . . . terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1). Of course, this statutory prohibition encompasses various types of discriminatory employment decisions, including demotions in which an employee is placed in another position with materially lesser pay, prestige, or responsibilities.  See Hinson v. Clinch County, Georgia Bd. of Educ., 231 F.3d 821, 829 (11th Cir. 2000); Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1448 (11th Cir. 1998).

There is no direct evidence that the decision to demote Plaintiff was made because of sex.  Rather, she attempts to prove this claim using circumstantial evidence of discrimination, rendering applicable the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).  See Hinson, 231 F.3d at 828.  Under this framework, the plaintiff must first establish a prima facie case, which creates a presumption of discrimination.  The employer must then produce sufficient evidence to indicate that it made the employment decision in question for one or more legitimate,

nondiscriminatory reasons.   If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are merely a pretext for unlawful discrimination. See Hinson, supra; McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-256.

Plaintiff might establish a prima facie case of discrimination by showing the following at trial: (1) that she is a woman, (2) that she was qualified for her store manager position; (3) that she was demoted; and (4) that she was replaced by a man. See Hinson, 231 F.3d at 828. Defendant admits that Plaintiff is a woman; that a decision had been made and communicated to Plaintiff that she was going to be removed her from her store manager position and demoted to a lesser position as a management trainee; and that Plaintiff was replaced as the store manager at Decatur by a man, Keith Kilgore. In attacking Plaintiff's ability to make out a prima facie case, Defendant argues only that Plaintiff was not "qualified" to hold her position because the Decatur store posted sustained losses during her managerial tenure. See Initial Submission of Marvin's Inc. in Support of its Motion for Summary Judgment (hereinafter "Defendant's Brief") at 9. However, the Court will assume for purposes of summary judgment that Plaintiff was at least minimally qualified for her position, which she held

for almost one year,[3] and that, as a result, she can make out a prima facie case.

Under the McDonnell Douglas analysis, a valid prima facie case creates a presumption that discrimination has occurred.  Walker v. Mortham, 158 F.3d 1177, 1183-84 (11th Cir. 1998) (citing Burdine, 450 U.S. at 254 n.7).  Under the second step of the analysis, the defendant may rebut a prima facie case of intentional discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment decision of which the plaintiff complains.  Walker, at 1184.  To satisfy this burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Combs v. Plantation

_____

[3]The Court would also note that the Eleventh Circuit has long recognized that in cases where an employee claims that, because of unlawful discrimination, her employer removed her from a position she has held for a "significant period of time," it generally may be inferred that she was "qualified" to hold the position for purposes of a prima facie case and that any job performance problems that are asserted by the employer as the basis for the employee's alleged lack of qualification may be appropriately addressed at the second and third stages of the McDonnell Douglas framework.  See Crapp v. City of Miami Beach, 242 F.3d 1017, 1020 (11th Cir. 2001); Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999); Young v. General Foods Corp., 840 F.2d 825, 830 n. 3 (11th Cir. 1988); Rosenfield v. Wellington Leisure Products, Inc., 827 F.2d 1493, 1495 n. 2 (11th Cir. 1987); Pace v. Southern Railway Sys., 701 F.2d 1383, 1386 n. 7 (11th Cir. 1983).

Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting Burdine, 450

U.S. at 254-55).   Thus, the Eleventh Circuit has characterized the

employer's burden at this intermediate stage as "exceedingly

light."   Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997);

Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir.

1983).   But see IMPACT v. Firestone, 893 F.2d 1189, 1193-94 (11th

Cir. 1990).

        The Court concludes that Defendant has satisfied its burden.

Defendant has offered evidence indicating that it decided to demote

Plaintiff from her store manager position to a manager-in-training

position "[a]s a result of the Decatur store's performance under

[her] management . . . ."   Rachael Cates Aff. at ¶ 7.   Further, it

appears undisputed that the demotion decision was based upon the

recommendation of Thomas Lawson, Plaintiff's regional manager.   He

conceded that he believed Plaintiff had done a "very, very good"

job at the merchandising of the store and the "appearance of the

store was good."   Lawson Dep. at 21.   He also admits that he told

Plaintiff that the 1999 budget figures were about 25% too high

because of the new Home Depot store.   Id. at 39.   However, he

claims that the budget discrepancy had "nothing to do" with the

decision to remove Plaintiff; rather, he suggested that it was the

fact that "[s]he was given every opportunity to improve [the] store

and instead of improving on every factor that we looked at, sales,

shrink, SOI and everything was going downhill every month basically, until she left the business." Id. at 40-41.

Thus, Plaintiff's demotion claim comes down to the third and final stage of the McDonnell Douglas analysis: pretext.  In order to survive summary judgment, Plaintiff must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the Defendant's proffered reason was not actually the motivation for its decision. See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997), cert. denied, 118 S.Ct. 685 (1998).  Plaintiff may do this (1) by showing that the employer's legitimate nondiscriminatory reason should not be believed; or (2) by showing that, in light of all of the evidence, a discriminatory reason more likely motivated the decision.  Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996).  See also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," but cautioning that such a showing may not always be adequate to sustain a finding of unlawful discrimination).

As a threshold matter, it should be recognized that federal courts "do not sit as a super-personnel

department that reexamines an entity's business
decisions. No matter how medieval a firm's practices, no
matter how high-handed its decisional process, no matter
how mistaken the firm's managers, [federal anti-
employment discrimination statutes do] not interfere.
Rather, our inquiry is limited to whether the employer
gave an honest explanation of its behavior."

Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en

banc) (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470

(11th Cir. 1991) (further citations omitted) (bracketed material

added). Further, a "plaintiff is not allowed to recast an

employer's proffered non-discriminatory reasons or substitute his

business judgment for that of the employer. Id. Thus, "[p]rovided

that the proffered reason is one that might motivate a reasonable

employer, an employee must meet that reason head on and rebut it,

and the employee cannot succeed by simply quarreling with the

wisdom of that reason." Id.

Plaintiff's principal pretext argument is that her store did

not actually post the substantial, sustained, and increasing losses

that are now suggested by Defendant. Pointing to the SOI figures

in the monthly financial reports, Defendant claims that while the

Decatur store had actual net loss of about $23,600 for the year to

date as of June 26, 1999, the net loss for the next month alone,

ending July 24, 1999, was about $25,500, which brought the year-to-

date net loss to about $49,000. Defendant contends that the next

month, ending August 21, 1999, was even worse, with a net loss for

the month of about $48,800, and a year-to-date loss of about $98,000. Finally, Defendant contends that the financial records show that the Decatur store continued to lose a substantial sum, about $38,100, for the month ending September 25, 1999, resulting in a year-to-date loss of about $136,200. Defendant's Exhibit 12 to Plaintiff's Dep.

Plaintiff, however, takes issue with Defendant's claims that these SOI figures represent actual net losses to the store. She contends that SOI is, rather, merely a comparison of actual net store income to target income set forth in a store's budget. And because, she continues, the 1999 budget figures for her store were undisputedly inflated insofar as they did not account for the new Home Depot store, the negative SOI figures cited by Defendant offer an artificially and exaggeratedly poor level of store performance. As evidence to support her interpretation of the meaning of SOI, Plaintiff offers only the following from her second affidavit:[4]

> The store operating income is not real money but a comparison to the budget set out for the year. My budget was 25% too high and Lawson told me that.
> . . . .
> Store operating income does not reflect real money.

---

[4]Plaintiff has included two separate affidavits in her evidentiary submission filed in opposition to Defendant's motion for summary judgment. Her "first" affidavit, Exhibit 2 to her evidentiary submission, is dated September 11, 2001, while her "second" affidavit, Exhibit 10 to her submission, is dated January 15, 2002.

> high and Tom Lawson told me so.  All these numbers are
> based erroneously.
>      The twenty-five % was never taken into account.  It
> wasn't in our monthly P & L's.  So, of course, the
> variances are going to be huge.

Plaintiff's "Affidavit and Declaration II," Exhibit 10 to
Plaintiff's "Evidentiary Submission in Opposition of Defendant's
Motion for Summary Judgment."  Defendant argues in its motion to
strike, however, that these statements in Plaintiff's second
affidavit are due to be excluded because they contradict her prior,
sworn deposition testimony, and she offers no explanation for the
discrepancy.

Federal courts have held "with virtual unanimity" that a party
cannot create a genuine issue of fact sufficient to survive summary
judgment simply by filing a later affidavit that "flatly
contradicts" that party's earlier sworn deposition, without
explaining the contradiction or attempting to resolve the
disparity. Cleveland v. Policy Management Systems Corp., 526 U.S.
795, 806 (1999).  Thus, where a party gives "clear answers to
unambiguous questions" in a deposition and thereafter attempts to
raise an issue of material fact in a contradictory affidavit that
fails to explain the contradiction, a court may disregard the
affidavit. Van T. Junkins and Associates v. U.S. Industries, Inc.,
736 F.2d 656, 657 (11th Cir. 1984).  However, this rule has been
applied "sparingly" in this circuit, Rollins v. TechSouth, Inc.,

833 F.2d 1525, 1530 (11th Cir. 1987), as the Court of Appeals has explained that "[t]o allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the . . . affiant . . . was stating the truth." Id., at 1530 (quoting Tippens v. Celotex Corp., 805 F.2d 949, 953-54 (11th Cir. 1986)).  Accordingly, even if it might be said that there is some discrepancy or tension between a party's deposition testimony and a later affidavit, such is not normally grounds to strike the latter; it merely creates questions of credibility or goes to the weight of the evidence, which are issues for the trier of fact. See Tippens, 805 F.2d at 953-54; Kennett-Murray Corp. v. Bone, 622 F.2d  887, 893-94 (5th Cir. 1980).[5] However, exclusion will be sanctioned where the affidavit affirmatively appears to be a "transparent sham," see Tippens, at 953; Kennett-Murray, 622 F.2d at 894 (quoting Choudhry v. Jenkins, 559 F.2d 1085, 1090 (7th Cir. 1977)), based on its unexplained and "inherent  inconsistency"  with  "clear  answers  to  unambiguous

---

[5]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

questions" on an issue of material fact during the deposition. <u>Rollins</u>, 833 F.3d at 1530.

During her deposition, Plaintiff was examined fairly extensively both about the nature of SOI and about the particular negative SOI figures that Defendant now offers as proof of actual losses to its Decatur store.   An examination of that deposition testimony reveals that Plaintiff expressly and repeatedly acknowledged that SOI does, in fact, represent a store's actual net profit or loss and that the negative SOI figures cited by Defendant do translate to actual, "real dollar" losses to the store, not mere variances from hypothetical, forecasted budgeted income.   <u>See</u> Plaintiff's Depo. at 73, 93-97, and 102-03. and 105-06.   The Court concludes that Plaintiff's more recent affidavit assertions that SOI is just a variance from the budget and does not represent any "real money" or "real dollar" loss to the store inherently conflicts with her clear deposition testimony. Further, nowhere in her affidavit or otherwise has Plaintiff attempted to explain this discrepancy.   Therefore, the Court concludes that Plaintiff's affidavit statements in question are due to be excluded as a sham.

Furthermore, the Court would also note that it is obvious from the face of the store operating statements that the Decatur store's negative "actual" SOI levels cited by Defendant are, in fact, net profits or losses, and not just paper or theoretical losses based

upon a comparison to forecasted income levels in the budget. First, the financial records reveal that the "actual" SOI represents the store's "actual" "grand total expenses"[6] subtracted from the store's "actual" "net margin,"[7] plus minor upward adjustments for any "consumer credit sales rebate" and "commercial finance charge income."   See Defendants Exh. 9-12 to Plaintiff's Depo.   Thus, SOI does represent a store's actual profit or loss. And second, those same financial records do indeed have "budget" SOI figures, for both the "current month" and the "year to date," as well as categories for each "variance" between "actual" SOI and "budget" SOI.   See Defendant's Exh. 9-12 to Plaintiff's Depo. But Defendant has referenced only the "actual" SOI figures as representing the net losses of Plaintiff's store; if one looks to the "variances" between the "actual" and "budget" SOI amounts, the negative figures for Plaintiff's store become even more, as Plaintiff puts it, "huge."   Plaintiff's Affidavit II.   For example, for the period ending July 24, 1999, the store posted an "actual" SOI of negative $25,500 for the month and negative $49,000 for the year to date.   Defendant's Exh. 10 to Plaintiff's Depo.   But the

---

[6]These include all expenses for payroll, payroll taxes, group insurance, advertising, as well as certain other specified "direct" and "indirect" operating expenses.

[7]"Net Margin" encompasses all "Net Sales," both retail and commercial; minus the cost of such goods sold, plus adjustments for "Shrinkage" and "Product Acquisition Discounts (& Costs)."

year to date.  Defendant's Exh. 10 to Plaintiff's Depo.  But the anticipated "budget" SOI amounts for the same period were positive $5,200 for the month and positive $52,200 for the year; so the SOI "variances" were negative $30,800 for the month and negative $101,200 for the year to date.  Id.  Similarly, while the year-to-date actual SOI in the final store income statement published during Plaintiff's tenure, for the period ending September 25, 1999, was about negative $136,200, the "variance" between that amount and the "budget" SOI (+$67,600) is far greater: -$203,800.  Defendant's Ex. 12 to Plaintiff's Depo.  Therefore, based upon the financial records and Plaintiff's own deposition testimony, it is abundantly clear that there was a rock-solid basis for Defendant to believe that the Decatur store was not only posting substantial, actual net losses under Plaintiff's management since the Home Depot store opened, but that it had done so consistently and that these losses had been steadily increasing from June until the time Plaintiff was removed from her post.

Nonetheless, Plaintiff argues that Lawson told her on several occasions that her store's budget was too high because of the opening of the new Home Depot and that he indicated to her that the Decatur store's sales would be considered satisfactory if she could maintain them to within 25% of the budget.  In light of these statements, Plaintiff suggests that she might prove pretext

over the budget-minus-25% figure for the year to date at the end of September, by some $241,549. See Plaintiff's Exh. 1 to Lawson Dep. The Court concludes, however, that such evidence does not sufficiently indicate pretext because it fails to rebut head-on the specific reasons offered by Defendant for the decision to demote Plaintiff and is of very limited probative value in any case.

It might be assumed that the Decatur store's net income for the year to date through the end of September was some $241,549 above the budget-minus-25% threshold Plaintiff was allegedly given by Lawson. However, what Lawson suggested was the motivation for the decision to demote Plaintiff was that a variety of store performance factors, particularly SOI, but also sales, had been declining substantially and steadily since June and continued through the end of September. The record fully supports that such did occur to the Decatur store's SOI, as detailed previously, and Plaintiff's allegations about what she was told with regard to net sales targets do not really address the store's consistent and growing failures with regard to the bottom line.

But in addition, the record demonstrates that the Plaintiff's store had, in fact, also been enduring a sustained trend of increasingly low net sales, which had prompted Lawson to warn Plaintiff in a meeting, about a month before he told her she was going to be demoted, that "[c]orporate is putting the heat on,"

and, "We've got thirty days to turn it, we've got a serious situation, we've got to start turning some sales . . . ." Plaintiff's Depo. at 110-12.[8]   Plaintiff's own calculations show

---

[8]In her second affidavit, Plaintiff seems to disavow that Lawson ever gave her a "30-day warning" to "turn" the store, as she there alleges, "In September of 1999, Mr. Lawson my Regional Manager, never told me I had thirty days to turn things around." Plaintiff's Affidavit II. Defendant argues in its motion to strike that this statement is due to be excluded because it conflicts with her prior deposition testimony. In Plaintiff's deposition, the following exchange occurred:

Q. Okay. Do you recall that Thomas [Lawson] told you that you had thirty days to show a great improvement on what we were doing here in the store?

A. His comment was - - and this is word for word when we sat down and talked to him, is we're in a serious - -

Q. Serious situation?

A. A serious situation. Corporate is putting the heat on, he said, I'll cover, because I know that the budgets are wrong, Rodney [Geeslin] should have caught these budgets. And he said that we need to concentrate on commercial sales, because that's where we need to hit - - that where your biggest income starts coming from, and that was his comment, as far as getting on the road.
        He said, But the store looks great, everything is running great. And then, you know, like I said, we were still dealing with a lot of theft issues, so I had to come into the store after being on the road and deal with this.

Q. I guess where we're not communicating is this. Did Thomas [Lawson] tell you that you had thirty days to try to make a difference?

A. Not in his words. He said that - - that corporate has given us thirty days to turn the store so - -

Q. Okay. Thomas [Lawson] told you - -

A. As us, not just me.

Q. But Thomas [Lawson] told you basically that the mandate from the home office was we've got thirty days to make a dent in there and see if we can't get things on a better financial footing or what?

that the Decatur store's actual net sales for each month had been steadily decreasing in relation to budgeted net sales since April and had actually dipped below the budget-minus-25% threshold, by which Plaintiff claims her store was to have been judged, in each of July (-27.5%), August (-30.2.%), and September (-29.9%), which were the last three full months she was at the store's helm.  See Plaintiff's Exh. 1 to Lawson Depo.  Further, while Plaintiff makes much of the fact that she kept the store's year-to-date net sales within 25% of the budget for the category through the end of September, it is only if one includes the net sales from January and February 1999, the two full months that Plaintiff's store budget was accurate because the Home Depot had not opened, that she was able to do so; without those two months, her store's net sales

---

A. He did even say anything about or what. He never said anything. He just said that we've got thirty days to turn it, we've got a serious situation, we've got to start turning some sales, get you out on the road, try to generate some sales.

Plaintiff's Dep. at 110-12.

The Court concludes that to the extent that Plaintiff may be asserting in her subsequent affidavit that Thomas Lawson never expressed to her that corporate had expressed serious concerns about the sales performance and financial condition of the Decatur store and that the store's performance over the next 30 days was going to be very important, her affidavit flatly contradicts her clear deposition answers and would be subject to exclusion as a sham. However, Plaintiff's affidavit statement does not necessarily inherently conflict with her deposition testimony in every conceivable respect. For example, it is not entirely clear from Plaintiff's deposition whether this "serious situation" conversation took place in September 1999, as opposed to, say, late August of the same year. Or, Plaintiff may simply be emphasizing in her affidavit that she did not perceive Lawson's statements to be a warning directed at her personally, which is actually consistent with her deposition testimony. Because the Plaintiff's affidavit statement is ambiguous in these respects, the Court concludes that Defendant's motion to strike is due to be denied insofar as it seeks exclusion of the statement for any purpose.

actually missed the 75%-of-budget mark by $35,569.[9]  Thus, the
Court concludes that Plaintiff cannot even show that an offered
explanation of "low sales" is unworthy of credence.

Plaintiff offers no evidence that Defendant treated any male
employee who managed a store with a similarly poor financial record
more favorably than she was.  Nor has Plaintiff offered any
evidence of statements indicating a gender-related bias on the part
of her superiors. Rather, the only things that Plaintiff offers to
show that her demotion was because of sex is that Lawson stated to
her several times that the decision to demote her had nothing to do
with her being a woman, although she had not raised the issue; that
she was ultimately replaced as the Decatur store manager by a male;
and that he was afforded an extra assistant manager over
merchandising, who was also male.[10]  However, the Court concludes
that these circumstances simply fall short of being sufficient to

_____

[9]According to Plaintiff, her store's actual net sales for
January 1999 were $387,998, which was $127,523 above the budget-
minus-25% figure of $260,475; the store's actual net sales for
February 1999 were $446,145, or $149,595 above the budget-minus-
25% figure of $296,550.  Thus, the combined amount over the
budget-minus-25% line for these two months, which do not reflect
competition with the Home Depot, were $277,118.

[10]At times, it appears that Plaintiff is perhaps suggesting
that she did not have any assistant managers at the Decatur
store.  See Plaintiff's Brief at 5, ¶ 9 & n.33.  However, she
explained at her deposition that while a merchandising assistant
manager position had been eliminated sometime after she arrived
to cut back on payroll, she did have some assistant managers, see
Plaintiff's Depo. at 69-71, 85.

show that the reasons offered by Defendant for the decision to demote Plaintiff are but a pretext for sex discrimination, given the overwhelming evidence of the store's poor financial performance. Accordingly, Defendant's motion for summary judgment is due to be granted as it pertains to Plaintiff's Title VII demotion claim.

### 2. Discharge

Title VII makes it an unlawful employment practice for a covered employer to "discharge" any individual because of sex. 42 U.S.C. § 2000e-2(a)(1). This proscription applies not only to "actual" discharges that are motivated by sex discrimination but also to those discharges that are merely "constructive." The former generally include those situations in which an employer "by acts or words, shows a clear intention to dispense with the services of an employee" Payne v. Crane Co., 560 F.2d 198, 199 (5th Cir. 1977), or the employer otherwise engages in communication that "would logically lead a prudent person to believe his tenure has been terminated," Certkova v. Connecticut Gen. Life Ins. Co., 92 F.2d 81, 88 (2nd Cir. 1996) (both cases quoted in Thomas v. Dillard Dept. Stores, 116 F.2d 1432, 1434 (11th Cir. 1997)). Where the discharge is "constructive," by contrast, it is the employee who has ostensibly chosen to end the employment relationship by resigning; but such is still actionable where the employee has

resigned in order to escape intolerable and illegal employment
requirements to which he or she is subjected because of sex.  See
Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993), Henson v. City of
Dundee, 682 F.2d 897, 907 (11th Cir. 1982).  However, it is only
where a plaintiff demonstrates that "[her] working conditions were
so intolerable that a reasonable person in [her] position would be
compelled to resign" that an employee might recover under Title
VII.  Id.  See also Durley v. APAC, Inc., 236 F.3d 651, 658 (11th
Cir. 2000).

The parties disagree whether Plaintiff's Title VII claim
founded upon her separation from employment is to be characterized
as an actual termination or was instead a constructive discharge.
At her deposition, Plaintiff repeatedly emphasized that she was, in
fact, fired by Lawson, her regional manager, during a telephone
conversation in which he gave her a choice of either accepting a
demotion and relocation or being terminated.  Defendant, on the
other hand, emphasizes that Plaintiff's complaint expressly states
that "[s]he left [her] employment under constructive termination,"
Complaint ¶ 5 (emphasis added).  The Court concludes, however, that
Defendant is entitled to summary judgment on this Title VII claim
regarding Plaintiff's separation from her employment, regardless of
whether such is characterized as a constructive or actual
discharge.

As noted previously, in order to prevail on a constructive discharge claim, a plaintiff must demonstrate that her working conditions were so made so "intolerable" because of sex discrimination, "that a reasonable person in [her] position would be compelled to resign." Morgan, 6 F.3d at 755. To the extent that Plaintiff might be seen as having resigned, the only thing in the record that potentially might be considered to have created "intolerable" working conditions was that Plaintiff had been advised that she was going to be demoted from her store manager position to a manager trainee position for four months at another store in Alabama at her current salary, and then she would be eligible for placement in a store manager or assistant store manager position when and where one became available. The Court finds that it is highly doubtful that such a demotion alone could constitute intolerable working conditions so as to allow a finding of a constructive discharge. However, even if it was assumed that it would, as the Court has already explained, the evidence does not reasonably indicate that Defendant's decision to demote Plaintiff was because of sex. Accordingly, insofar as the demotion might even be viewed as creating intolerable working conditions, there is not enough evidence reasonably to suggest that sex discrimination was at the root of such working conditions. Finally, Plaintiff expressly admitted that she did not decline the demotion and leave

her employment because of any intolerable working conditions that
existed by virtue of sex discrimination; rather, she states that
she actually enjoyed working for Defendant but that she refused to
accept the demotion simply because she could not afford to pay the
moving expenses that would accompany her relocation.    See
Plaintiff's Dep. at 131.   The Court concludes that Defendant is
entitled to summary judgment on Plaintiff's Title VII claim to the
extent that she is seeking to recover under a constructive
discharge theory.

    The same result is reached if Plaintiff was fired, as she
claims.  Assuming that events transpired just as Plaintiff alleges,
there is still no way for a jury reasonably to infer that Plaintiff
was terminated because of sex.   Plaintiff acknowledges that Lawson
first told her simply that Defendant was going to demote her to the
management trainee position, and there is no indication whatsoever
that this offer to remain with the company was anything but bona
fide.  It was only when Plaintiff asked Lawson what would happen if
she did not accept the demotion that he allegedly stated that she
would be terminated.  And it was only when Lawson confirmed that
Defendant was not going to pay her moving expenses that Plaintiff
"chose" the secondary "option" of termination Lawson allegedly
extended to her.  It is simply manifest from these circumstances
that any termination decision that occurred was for a non-

discriminatory reason: that Plaintiff refused to accept the demotion that was offered to her, which the Court has explained has not been shown to have been because of her sex. And Plaintiff has offered nothing to show pretext, such as evidence that a male manager who voiced that he would not accept a demotion and was treated more favorably than she was, nor has she presented any other evidence tending to show that she was terminated because of sex.   The Court concludes that Defendant's motion for summary judgment is due to be granted as it applies to Plaintiff's claim that she was actually discharged because of sex, in violation of Title VII.

### B.  The Title VII and Equal Pay Act Wage Claims

Plaintiff also claims that Defendant intentionally discriminated against her by paying her less than similarly situated male employees. "Gender-based discrimination in rates of pay to employees . . . is prohibited by both the Equal Pay Act[11] .

---

[11]

> The EPA generally prohibits a covered an employer from
>
> discriminat[ing], within any establishment . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . .

26 U.S.C. § 206(d)(1).

. . as well as by Title VII[12] . . . ."   <u>Miranda v. B & B Cash Grocery Store, Inc.</u>, 975 F.2d 1518, 1526 (11th Cir. 1992) (footnotes added).  The Eleventh Circuit has explained as follows regarding the basic differences between the proof that is required to prevail under each of the two laws:

> A plaintiff suing under the [EPA] must meet the fairly strict standard of proving that she performed substantially similar work for less pay.  The burden then falls to the employer to establish one of the four affirmative defenses provided in the statute.  Under the disparate treatment approach of Title VII, however, there is a relaxed standard of similarity between male and female-occupied jobs, but a plaintiff has the burden of proving an intent to discriminate on the basis of sex . . . ."

<u>Id.</u> (footnote omitted).


### 1.  Title VII


As with her other Title VII claims, Plaintiff attempts to prove this claim by use of circumstantial evidence, again bringing the <u>McDonnell Douglas</u> burden-shifting framework into play. <u>Miranda</u>, 975 F.2d at 1528.  That is, Plaintiff must first establish a prima facie case of discrimination by a preponderance of the

---

[12]Title VII provides in relevant part that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation . . . because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).

evidence.  The Defendant then has a burden of producing evidence sufficient to indicate that it made the employment decision in question for a legitimate, non-discriminatory reason.  If Defendant satisfies this burden, Plaintiff must prove that the legitimate reason has been offered as a mere pretext for discrimination.  <u>See</u> <u>id.</u>

In order to establish a prima facie case of wage discrimination under Title VII, Plaintiff would have the burden at trial to prove that she occupies a job similar to that of a higher paid male.  <u>Id.</u> 975 F.2d at 1529; <u>Meeks v. Computer Associates</u> <u>International</u>, 15 F.3d 1013, 1019 (11th Cir. 1994).  Defendant asserts that Plaintiff will be unable to meet this obligation.  Of course, a party moving for summary judgment does not shift the burden of production to the non-movant simply by stating that the non-movant will not be able to prove her case at trial; the movant must point to evidence in the record affirmatively demonstrating the absence of a genuine issue of material fact.  <u>See</u> <u>Mullins v.</u> <u>Crowell</u>, 228 F.3d 1305, 1313-14 (11th Cir. 2000).  Defendant attempts to satisfy its movant's burden by referring the Court to the affidavit of its vice president, Thomas Seifert.  <u>See</u> Defendant's Brief at 11-12.  There, Seifert states that he had the responsibility for determining the salaries of certain employees, including "new" store managers, who were, he alleges, "typically"

started at yearly salary of $40,000, as was Plaintiff.  Affidavit
of Thomas Seifert, Tab 3 to Defendant's Evidentiary Submission
("Seifert Affidavit") at ¶3.   However, Seifert also expressly
acknowledges that other starting managers "may have been"
compensated at a higher rate based upon a "number of factors." Id.
at  ¶4.   While  such  other  factors  may  be  relevant  at  the
intermediate stage of McDonnell Douglas in the context of examining
potentially legitimate, non-discriminatory reasons for any material
disparity in pay between Plaintiff and male store managers,
Seifert's affidavit does not at all foreclose the possibility that
Plaintiff will be able to show that one or more male employees of
Defendant in substantially similar jobs to Plaintiff were paid more
than she was.

Although the Court finds that Defendant has failed to satisfy
its initial burden as the movant for summary judgment to prove that
Plaintiff will be unable to prove an element of her prima facie
case, the Court notes that its own review of the record has
revealed evidence indicating that among the 16 store managers
employed by Defendant at the time of Plaintiff's termination in
mid-October 1999, there were no fewer than eight males who were
paid at a higher rate than was Plaintiff.   See Exhibit A to
Affidavit of Rachael Cates, Tab 1 to Defendant's Evidentiary
Submission.   These male store managers (along with their salaries

at the time) were as follows:  James Breasseale ($51,500); Kenneth Buchanan ($49,000); Joseph Frank ($65,000); Tony Hannah ($44,000); Jeffrey Harper ($42,000); Charlie Haynes ($50,000); Lamar Knight ($43,750); and Jesse Whitaker, ($46,001.80).  Id.  There is no evidence indicating that the store manager positions at Defendant's various locations do not entail substantially similar skills and responsibilities, so the Court finds that such evidence of disparate wages between Plaintiff and other store managers could itself be sufficient to make out a prima facie case of pay discrimination under Title VII.

Defendant argues, however, that, even assuming Plaintiff can make out a prima facie case of pay discrimination, it is entitled to summary judgment because it has produced evidence indicating that any pay disparities between Plaintiff and similarly situated males were based upon legitimate, non-discriminatory criteria and Plaintiff cannot, Defendant contends, show that these reasons were pretextual.  See Meeks v. Computer Associates, 15 F.3d 1013, 1019 (11th Cir. 1994).  Specifically, Defendant again refers the Court to the affidavit of Seifert, who there states that, in fulfilling his responsibilities in setting the salaries of "new" or "starting" store managers, he "considered and based [his] decision" on "a number of factors such as prior retail experience and the quality of that experience - - for example, whether it had been gained in

the same industry or if the employee had prior multi-unit experience - - profitability of a given store, the size of a store's market, and prior management experience . . . ." Seifert Aff. ¶4.

The Court concludes, however, that Seifert's affidavit does not satisfy Defendant's burden at the intermediate stage of the <u>McDonnell Douglas</u> analysis so as to allow summary judgment on Plaintiff's Title VII wage claim.  Seifert's affidavit and other evidence setting forth the salaries of Defendant's store managers do suggest that Plaintiff's compensation was in line with what Defendant generally paid its "new" store managers in their first year, $40,000. <u>See</u> Exhibit A to Affidavit of Rachael Cates. Immediately prior to Plaintiff's removal as the manager in Decatur, Defendant employed eight first-year managers, six of whom, including Plaintiff, were paid the same yearly salary as Plaintiff. <u>Id.</u> Only two were paid more, Stacy Harrison, a female who was paid $42,500, and Lamar Knight, a male who was paid $43,750. <u>Id.</u>  And while Seifert indicates in his affidavit that he generally considers a "number of factors such as" the legitimate ones he sets forth, the record is unclear with respect to which specific factors of the ones recited might or might not have played a role in his

particular decision to pay Knight more than Plaintiff.[13]  Indeed, by Seifert's statement that he considered a "number of factors <u>such as</u>" the specific ones expressly stated, Seifert Aff. at ¶4 (emphasis added), that list of factors would appear to be non-exclusive; this would leave open the possibility that, in setting the salaries of new managers, he also considered and based his decisions on other factors that would not constitute a legitimate, non-discriminatory reasons for purposes of Title VII.  For example, if Seifert based his decision to pay Knight more than Plaintiff simply because of their "prior pay history," Defendant's Brief at 12, such could not be relied upon exclusively to justify the salary disparity.  <u>See</u> <u>Miranda</u>, 975 F.2d at 1530 (holding that prior salary alone was an "illegitimate market force theory" that could not be used as a proper basis for paying a female Title VII plaintiff less than male employees in her classification).

---

[13]It is also at least somewhat questionable whether Seifert's statements, which seem to set forth merely his "general practice" regarding setting salaries rather than how he made any particular salary decision with regard to any given employee, are sufficient to satisfy Defendant's burden at the intermediate stage of the <u>McDonnell Douglas/Burdine</u> framework.  <u>See</u> <u>IMPACT v. Firestone</u>, 893 F.2d 1189, 1194 (11th Cir. 1990) ("Moreover, the statement by the personnel director . . . that it was the <u>general practice</u> of the department to select the best qualified [applicant], would not satisfy the requirements [of the employer's burden to produce evidence articulating a legitimate, non-discriminatory reason for the challenged employment action]." (emphasis original)).

But just as significantly, Seifert does not indicate in his affidavit that he was responsible for setting salaries for those who were not "new" or "starting" store managers.  There does seem to be at least some evidence indicating that Defendant's "rookie" store managers may have been eligible to receive a pay raise following their first annual evaluation, <u>see</u> Cates Affidavit, ¶¶4-5.  And while seven of the eight male store managers who were paid more than Plaintiff had been in their respective positions for more than one year, Defendant has not directed the Court to any evidence indicating that this greater seniority was, in fact, the basis that Defendant actually used to justify the male mananers' higher pay. Nor has Defendant referred the Court to evidence suggesting who set the salaries for these managers or what factors were the basis for doing so.  Rather, Defendant has simply set forth these store managers' respective salaries and the dates of their original hire and when they became a store manager, leaving it for a fact finder to infer that the male managers' greater seniority was, in fact, the reason that Defendant must have used as the basis for their greater pay.  However, in order to meet its intermediate burden under <u>Burdine</u>, the employer must produce admissible evidence indicating that it <u>actually based its employment decision</u> on a reasonably specific, legitimate reason; it is not enough to offer evidence suggesting merely that circumstances existed which would

have given rise to a legitimate reason for disparate treatment, had the employer actually relied upon such reason.  IMPACT v. Firestone, 893 F.2d 1189, 1193-94 (11th Cir. 1990).  Because Defendant has not directed the Court to admissible evidence indicating specifically why it decided to compensate each potential male comparator at a higher rate than Plaintiff, Defendant is not entitled to summary judgment on Plaintiff's Title VII pay claim.


### 2.  Equal Pay Act


To establish a prima facie case under the EPA, the plaintiff has the burden at trial to prove that her job and that of a male employee who is paid more are substantially equal.  Arrington v. Cobb County, 139 F.3d 865, 876 (11th Cir. 1998); Miranda, 975 F.2d at 1533.  A male employee who replaces the plaintiff may serve as such a comparator.  Id., 139 F.3d at 876 n.22 (citing Gosa v. Bryce Hosp., 780 F.2d 917, 919 (11th Cir. 1986)).  A plaintiff does not have to prove, however, that the employer actually harbored an intent to discriminate against her on the basis of sex.  See Mitchell v. Jefferson County Bd. of Educ., 936 F.2d 539 (11th Cir. 1991).  Nor does a plaintiff need show that she and a male comparator actually have the same skills or qualifications as individuals.  See Arrington; Miranda, supra.  Rather, the focus at

the prima facie stage is upon the primary duties of the jobs at issue, as opposed to duties that are merely incidental or insubstantial, and whether the actual content of the jobs impose substantially similar demands with regard to skills, effort, responsibility, and working conditions. See id.; Miranda, supra. See also Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). While formal job titles and job descriptions are relevant to the inquiry of whether job content is substantially equivalent, they are they are not dispositive. Arrington, 139 F.3d at 876; Miranda, 975 F.2d at 1533.

Once a plaintiff establishes a prima facie case as applied to even one male comparator, see Mulhall, 19 F.3d at 590 (citing Mitchell v. Jefferson County Bd. of Educ., 936 F.2d 539, 547 (11th Cir. 1991); EEOC v. White & Son Enters., 881 F.2d 1006, 1009 (11th Cir. 1989)), the only way for the defendant to escape liability is to prove, as an affirmative defense, that the wage differential is justified by one of four exceptions set forth in the EPA. Irby v. Bittick, 44 F.3d 949, 954 (11th Cir. 1995). Those exceptions are: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). "The [employer's] burden is a 'heavy one,' because . . . 'defendants must show that the factor of sex provided no basis

for the wage differential.' " <u>Irby</u>, 44 F.3d at 954 (quoting <u>Mulhall</u>, 19 F.3d at 590 (emphasis in <u>Mulhall</u>)).  If the employer fails to meet this burden, the court must enter judgment for the plaintiff.  <u>Id.</u>  If, on the other hand, the employer overcomes its burden, "the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential."  <u>Id.</u>

Defendant argues that it is entitled to summary judgment on Plaintiff's EPA claim.  In support, Defendant makes only the following assertions in its initial brief: (1) that Plaintiff "cannot satisfy [her] burden" to show that she was paid less than a male employee doing substantially similar work; (2) that Plaintiff was paid at the same rate as five male store managers; and (3) that a female manager, Stacy Harrison, was paid at a rate greater than that at which Plaintiff and seven male managers were paid."  Defendant's Brief at 14.

As to the first assertion, the Court acknowledges that Plaintiff will indeed have the burden <u>at trial</u> to prove that she was paid less for equal work done by a male employee.  However, it is Defendant, as the movant for summary judgment, who now has the initial burden to produce evidence demonstrating that Plaintiff will not be able to meet her burden at trial, and just stating that she will be unable to do so is not sufficient.  <u>See</u> <u>Mullins</u>, 228

F.3d at 1313-14.  Turning to Defendant's allegations that Plaintiff
was paid the same as five male store managers and that a female
manager was paid more than Plaintiff and seven male store managers,
such appear to be undisputed.  However, these circumstance do not
demonstrate that Defendant is entitled to judgment as a matter of
law on Plaintiff's EPA claim, as required for an award of summary
judgment under Federal Rule of Civil Procedure 56(c).  As stated
previously, in order to prevail on this claim, Plaintiff need name
only a single male comparator who is performing equal work and is
paid more, and she does not have to demonstrate that Defendant
actually harbored an intent to discriminate because of sex.  None
of Defendant's above assertions at all foreclose the possibility
that Plaintiff will be able to prove that she was paid less than
one or more male store managers.  Indeed, as explained previously,
there is evidence indicating that Plaintiff was paid less than
eight male store managers, and Defendant has failed to argue or
demonstrate how the occupants of these other store manager jobs
could not be reasonably viewed as comparators for purposes of an
EPA prima facie case.

      Furthermore, Defendant has argued in its initial brief only
that Plaintiff cannot name a comparator; it has not expressly
sought to assert any of the four statutory affirmative defenses to
an EPA claim.  But even if the Court were to incorporate by

reference the arguments and evidence regarding the allegedly legitimate, non-discriminatory reasons Defendant offered in response to Plaintiff's Title VII pay claim, summary judgment would still not be warranted on Plaintiff's EPA claim. The previously described weaknesses, gaps, and ambiguities in Defendant's evidence and arguments regarding the reasons for pay disparities under Title VII would not only be present here, but they are amplified. A Defendant's burden is merely one of production under <u>McDonnell Douglas</u> with regard to explaining why it paid a male employee more for substantially similar work for purposes of a Title VII claim, while the Defendant's legitimate reason or reasons are an affirmative defense under the EPA, upon which the employer bears an additional burden of persuasion. Defendant is not entitled to summary judgment on Plaintiff's EPA claim.

### IV.   CONCLUSION

Based upon the foregoing, the Court concludes that Defendant's motion to strike (Doc. 21) is due to be **GRANTED IN PART AND DENIED IN PART** and that Defendant's motion for summary judgment (Doc. 17) is likewise due to be **GRANTED IN PART AND DENIED IN PART**. Said motion for summary judgment is due to be **GRANTED** to the extent that pertains to Plaintiff's Title VII claims regarding her demotion and

her discharge, as the Court has determined that there is no genuine issue of material fact and that Defendant is entitled to judgment as a matter of law on those claims.  Accordingly, those claims are due to be **DISMISSED** with prejudice.  But Defendant's motion for summary judgment is due to be **DENIED** insofar as it pertains to Plaintiff's Title VII and EPA claims of wage discrimination.

   **IT IS SO ORDERED**, this _27th_ day of February, 2002.

_____
   H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE